1

2

3

4

5

6                     UNITED STATES DISTRICT COURT

7                     CENTRAL DISTRICT OF CALIFORNIA

8

9    PATRICK ADAMS,                    )    CASE NO. CV 15-05700 MMM (ASx)
                                       )
10              Plaintiff,             )    ORDER GRANTING DEFENDANT'S
                                       )    MOTIONS TO DISMISS
11        vs.                          )
                                       )
12   HARTFORD CASUALTY INSURANCE       )
     COMPANY, and DOES 1–10,           )
13                                     )
                Defendants.            )
14                                     )
                                       )
15                                     )

16       On June 26, 2015, Patrick Adams sued Hartford Casualty Insurance Company ("Hartford") in

17   Los Angeles Superior Court, alleging claims for breach of contract, breach of the implied covenant of

18   good faith and fair dealing, and negligence.[1]  Hartford removed the case to federal court on July 28,

19   2015.[2]  On August 25, 2015, Adams filed a first amended complaint, pleading claims for breach of

20   contract and breach of the implied covenant of good faith and fair dealing.[3]  On September 11, 2015,

21   Hartford moved to dismiss Adams' first amended complaint.[4]  Adams opposed the motion on

22

23   _____

24       [1]Notice of Removal, Exh. 1 ("Complaint"), Docket No. 1-1 (Jul. 28, 2015).

25       [2]Notice of Removal.

26       [3]First Amended Complaint ("FAC"), Docket No. 13 (Aug. 25, 2015).

27       [4]Defendant Hartford Insurance Company's Motion to Dismiss Plaintiff's First Amended
     Complaint ("Motion"), Docket No. 17 (Sept. 11, 2015).  See also Defendant Hartford Insurance
28   Company's Reply in Support of Its Motion to Dismiss Plaintiff's First Amended Complaint ("Reply"),

October 19, 2015.[5]

# I. FACTUAL BACKGROUND

## A. Facts Alleged in the Complaint

Adams brings this action as the assignee of Beryl Zyskind's claims against Hartford.[6] Adams alleges that he was previously employed by Sheervision, Inc. ("Sheervision"). At some point prior to September 14, 2012, his employment was apparently terminated, because on that date, he sued Sheervision and Zyskind in Los Angeles Superior Court, alleging claims for wrongful discharge, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of an implied covenant not to terminate without cause, and infliction of emotional distress ("the underlying action").[7] At the time Adams filed suit, Zyskind was purportedly a senior officer at Hartford with authority to make employment decisions on its behalf.[8]

Adams alleges that at all relevant times, Sheervision was insured by Hartford under a "business owner's policy" ("the policy").[9] The policy purportedly covered Sheervision's employees and officers as well as the company.[10] Zyskind allegedly tendered defense of the underlying action to Hartford under the policy and Hartford purportedly refused to defend and indemnify him for damages he incurred settling the underlying action.[11] Adams asserts that, as a result, he and Zyskind entered into a written confidential settlement agreement, pursuant to which Adams dismissed the underlying action against

---

Docket No. 24 (Oct. 26, 2015).

[5]Plaintiff Patrick Adams' Opposition to Defendant's Motion to Dismiss First Amended Complaint ("Opposition"), Docket No. 23 (Oct. 19, 2015).

[6]FAC, ¶ 1,

[7]*Id.*, ¶ 6.

[8]*Id.*

[9]*Id.*, ¶ 7.

[10]*Id.*

[11]*Id.*

2

Zyskind and took an assignment of Zyskind's claims against Hartford.[12] To date, Zyskind has not paid Adams the amounts owed under the settlement agreement.[13]

### B. Hartford's Request for Judicial Notice

Hartford asks that the court take judicial notice of various documents in deciding its motion to dismiss.[14] Because Rule 12(b)(6) review is confined to the complaint, the court typically does not consider material outside the pleadings (e.g., facts presented in briefs, affidavits, or discovery materials) in deciding such a motion. *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996). It may, however, properly consider exhibits attached to the complaint and documents whose contents are alleged in the complaint but not attached, if their authenticity is not questioned. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

In addition, the court can consider matters that are proper subjects of judicial notice under Rule 201 of the Federal Rules of Evidence. *Id.* at 688-89; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc*., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990); see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").[15] The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint" or proper subjects of judicial notice. *Steckman v. Hart Brewing Inc*., 143 F.3d 1293, 1295 (9th Cir. 1998); see also *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

---

[12]*Id.*, ¶ 8.

[13]*Id.*

[14]Defendant Hartford Casualty Insurance Company's Request for Judicial Notice ("RJN"), Docket No. 18 (Sept. 11, 2015).

[15]Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit").

Hartford first asks that the court consider the insurance policy it issued to Sheervision. The court can consider this document under the incorporation by reference doctrine, because its existence is alleged in the complaint and Adams does not question the authenticity of the document Hartford proffers. See *Lee*, 250 F.3d at 688; *Branch*, 14 F.3d at 453-54.[16]

Hartford also asks that the court take notice of several documents related to the underlying action, *Adams v. Sheervision Inc.*, including the complaint, the docket, and an order of dismissal. Pleadings and records from a prior judicial action are proper subjects of judicial notice. See *Ejigu v. City of Los Angeles*, 286 Fed. Appx. 977, 978 (9th Cir. July 21, 2008) (Unpub. Disp.) ("The district court properly took judicial notice of the record in the prior action," citing *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007)); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (a court may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" (citation omitted)).

Consequently, the court grants Hartford's request for judicial notice in full.


## II. DISCUSSION

### A.    Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them

---

[16]Adams objects that Hartford is "asking the Court to take judicial notice of its interpretation of the subject policy (as opposed to the policy itself)." (Opposition at 4). The court takes notice only of the policy and its terms. To the extent the court ultimately agrees with Hartford's interpretation of the policy terms, it does so after conducting an independent analysis of the policy.

in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544, 553–56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

### B.    Whether Adams' Complaint Must be Dismissed

Hartford argues that Adams' claims for breach of contract and breach of the implied covenant of good faith and fair must be dismissed for two independent reasons. The court addresses each reason in turn.

### 1.    Whether Zyskind has Suffered Injury

Hartford first argues that the claims must be dismissed because Adams' assignor – Zyskind – has not suffered any injury.[17] Hartford cites the first amended complaint's allegation that Zyskind has yet to perform his obligations under the settlement agreement by paying Adams the amount he agreed to pay in consideration for dismissal of the underlying action. It argues that "[b]ecause no judgment was

---

[17]Motion at 11.

5

ever entered against Zyskind, and because he has admittedly not paid any money to Adams in the underlying action, Zyskind has suffered no actual injury as a result of any of the claims in the underlying lawsuit or due to Hartford's coverage declination."[18]

The court is not persuaded by this argument. The first amended complaint, whose factual allegations the court must accept as true at this stage in the litigation, states that Zyskind settled the underlying action by agreeing to pay Adams a certain sum of money.[19] "If an insurer 'erroneously denies and/or improperly refuses to defend the insured' in violation of its contractual duties, 'the insured is entitled to make a reasonable settlement of the claim in good faith and may then maintain an action against the insurer to recover the amount of the settlement.'" *Isaacson v. Cal. Ins. Guar. Ass'n*, 44 Cal.3d 775, 791 (1988); see also *Hamilton v. Maryland Cas. Co.*, 27 Cal.4th 718, 728 (2002) ("[T]he denial of coverage and a defense entitles the policyholder to make a reasonable, noncollusive settlement without the insurer's consent and to seek reimbursement for the settlement amount in an action for breach of the covenant of good faith and fair dealing"); *Smith v. State Farm Mut. Auto Ins.*, 5 Cal.App.4th 1104, 1110 (1992) ("Where the insurer breaches its duty to defend, it is well established that the insured's damages may include the amount of a reasonable settlement"). Although Zyskind has apparently not yet paid the amount contemplated by the settlement, nothing in the complaint indicates that the debt owed by Zyskind is uncollectible or is not otherwise a bona fide debt.

Hartford argues, however, that the timing of Zyskind's *payment* of funds pursuant to the settlement agreement is crucial. It contends that an insured who sues an insurer to recover the amount of a settlement suffers injury only when he actually pays the other party what is owed under the settlement agreement; it is not enough, Hartford asserts, that the insured has *incurred* the liability. In support of this proposition, it cites *Smith*, 5 Cal.App.4th 1104. There, the court of appeal stated that "a judgment against the insured (or . . . a *payment* by the insured in settlement of a claim) is a condition to the insured's right to assign the claimant a cause of action for bad faith against the insurer." *Id*. at

---

[18]*Id.*

[19]FAC, ¶ 8 ("Pursuant to the [settlement] agreement, the total amount paid [to Adams] would include sums paid by Sheervision and sums paid by Zyskind").

1114 (emphasis added). Based on this statement by the appellate court, Hartford asserts that a debt created by a settlement agreement can constitute cognizable injury only where the insured has actually satisfied the debt by paying it.[20]

The *Smith* court did not limit its holding in this way, however. In *Smith*, the insured, Donnelly, was involved in an automobile accident with plaintiffs' son that led to the son's death. Plaintiffs brought a wrongful death action against Donnelly in state court. *Id.* at 1108. One of Donnelly's insurers – State Farm – denied coverage and refused to defend the action. *Id.* Prior to trial, plaintiffs and Donnelly settled. *Id.* As part of the settlement agreement, the parties stipulated to the entry of judgment against Donnelly and in favor of plaintiffs, and Donnelly assigned all claims he might have against State Farm for refusing to defend or indemnify to plaintiffs. *Id.* Plaintiffs covenanted as part of the settlement agreement to refrain from executing the stipulated judgment against Donnelly. *Id.* at 1108–09. When plaintiffs sued State Farm on Donnelly's claim, the court rejected the suit. The court of appeal affirmed, holding that the covenant not to execute eliminated any possibility that the insured would suffer injury because it "shield[ed] the insured from . . . liability." *Id.* at 1114. Because the settlement agreement was illusory as a result of the covenant not to execute, it did not represent "a recovery against the insured" and therefore did not constitute an injury to the insured for which the insurer could be held liable. *Id.*; cf. *Doser v. Middlesex Mutual Ins. Co.*, 101 Cal.App.3d 883, 893 (1980) (rejecting a claim brought by an assignee where the assignment had been given "in lieu of payment of any monies"). As can be seen, *Smith* stands for the proposition that a settlement agreement in which an insured agrees to pay a particular amount to the plaintiff in an underlying action constitutes a cognizable injury to the insured only if the liability is genuine and not negated by a covenant not to execute. That this is so is confirmed by the way in which the *Smith* court distinguished another case, *Sunseri v. Camperon Del Valle Stables, Inc.*, 185 Cal.App.3d 559 (1986):

"Appellants cite [*Sunseri*], which also involved a stipulated judgment. [In *Sunseri*,]

---

[20]Motion at 11 ("[T]he FAC admits that the portion of the settlement to be paid by Zyskind has yet to be paid to Adams in the underlying suit. As such, Zyskind has not yet actually suffered any assignable injury by which Adams can now pursue Hartford in the instant action" (internal quotation marks and alterations omitted)).

7

[f]ollowing the insurer's failure to defend an action for personal injuries, the insured consented to a judgment which it assigned to the claimant. When the claimant brought an action against the insurer based on the judgment, the insurer moved to set it aside. The trial court denied the motion. On appeal, the Court of Appeal affirmed, holding that the insurer could be bound by the stipulated judgment. The decision does not indicate, however, that the judgment was combined with a covenant not to execute. Thus, unlike the stipulated judgment at issue here, it could bind the insurer under Civil Code section 2778, subdivision 5." *Smith*, 5 Cal.App.4th at 1114–15.

Thus, because Hartford has not argued that the settlement was collusive or otherwise reached in bad faith, Hartford cannot persuasively contend that Zyskind's debt to Adams under the settlement agreement is not a bona fide liability. This conclusion is further supported by more recent California cases that have disagreed with *Smith*, and held that an assignment coupled with a covenant not to execute effects a valid transfer of rights that permits an assignee of the insured to sue the insurer, at least in situations – as here – in which the insurer allegedly failed to defend in addition to failing to indemnify. See *Hamilton*, 27 Cal.4th at 728 ("As we have explained in previous cases, the denial of coverage and a defense entitles the policyholder to make a reasonable, noncollusive settlement without the insurer's consent and to seek reimbursement for the settlement amount in an action for breach of the covenant of good faith and fair dealing. '[W]here the insurer has repudiated its obligation to defend[,] a defendant in the absence of fraud may, without forfeiture of his right to indemnity, settle with the plaintiff upon the best terms possible, taking a covenant not to execute,'" quoting *Samson v. Transamerica Ins. Co.*, 30 Cal.3d 220, 240 (1981)); *Risely v. Interinsurance Exchange of Auto. Club*, 183 Cal.App.4th 196, 208 (2010) ("Where the insurer denies its insured a defense for covered claims, the insured may make a reasonable, noncollusive settlement with the third party, without the insurer's consent. The insured may assign its claims against the insurer to the third party in exchange for a covenant not to execute on the settlement. The third party may then seek damages from the insurer for breach of duties that the insurer owed to the insured, in a separate action for breach of contract and breach of the covenant of good faith and fair dealing"); *Roman v. Unigard Ins. Group*, 26 Cal.App.4th 177, 184 (accepting an assignment with a covenant not to execute, because the settlement was made in

good faith). In these cases, the presence of a covenant not to execute obviated the need for the insured to pay the settlement amount; nonetheless, these courts concluded that the existence of the liability constituted injury and conferred standing to sue on the third party transferee. The court thus declines to dismiss Adams' claims on the basis that his assignor has suffered no injury.

## 2. Whether Adams Has Plausibly Stated a Claim for Breach of Contract or Breach of the Implied Covenant of Good Faith and Fair Dealing

Hartford next argues that Adams has failed to state a claim for breach of contract or breach of the implied covenant of good faith and fair dealing because the policy expressly excludes coverage for employment-related claims such as those Adams asserted against Zyskind.[21]

### a. Legal Standard Governing the Duty to Defend

"Although insurers and insureds routinely speak of the insurer's duty to 'indemnify and defend' as if the duties were coextensive, it is well settled that the duty to defend is broader than the duty to indemnify." *Cal. Ins. Guar. Ass'n v. Wood*, 217 Cal.App.3d 944, 947 (1990) (citing *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263, 274 (1966)). "[T]he insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Id.* at 300; see also *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.*, 9 Cal.4th 27, 39 (1994) (quoting *Gray*, 65 Cal.2d at 276 n. 15); *Uhrich v. State Farm Fire & Cas. Co.*, 109 Cal.App.4th 598, 608 (2003) ("[T]he obligation to defend is not without limits. . . . [T]he duty to defend derives from the insurer's coverage obligations assumed under the insurance contract. Thus, where there is no potential for coverage, there is no duty to defend," quoting *Quan v. Truck Ins. Exchange*, 67 Cal.App.4th 583, 591-92 (1998) (internal quotation marks and citations omitted)). "Where there is no potential for the third party to recover on a covered claim, there is no duty to defend." *Devin v. United Services Auto. Assn.*, 6 Cal.App.4th 1149, 1157 (1992) (citations omitted). Where there is a possibility of coverage, however, the insurer must defend. To prevail, therefore, "the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." *Montrose Chemical Corp. v. Superior Court*, 6 Cal.4th 287, 300

---

[21]Motion at 9.

9

(1993).

Typically, an insurer's duty to defend is judged "in the first instance by comparing the allegations of the complaint with the terms of the policy." *Id.* at 295. "Since pleadings are easily amended, the proper focus is on the facts alleged, rather than the theories for recovery. . . . The ultimate question is whether the facts alleged 'fairly apprise' the insurer that the suit is upon a covered claim." *Michaelian v. State Comp. Ins. Fund*, 50 Cal.App.4th 1093, 1106 (1996). See also *Swain v. California Casualty Insurance Co.*, 99 Cal.App.4th 1, 8 (2002) ("[C]overage turns not on 'the technical legal cause of action pleaded by the third party' but on the '*facts* alleged in the underlying complaint[.]' . . . A general boilerplate pleading . . . adds nothing to a complaint otherwise devoid of *facts* giving rise to a potential for covered liability," citing *Barnett v. Fireman's Fund Insurance Co.*, 90 Cal.App.4th 500, 510 (2001); *Michaelian*, 50 Cal.App.4th at 1107)).

"Facts extrinsic to the complaint [can] also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Montrose Chemical Corp.*, 6 Cal.4th at 295. See also *State Farm Fire & Casualty Co. v. Century Indemnity Co.*, 59 Cal.App.4th 648, 657 (1997); *Saylin v. Cal. Ins. Guar. Ass'n*, 179 Cal.App.3d 256, 263 (1986) ("For an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit"). California courts consider all facts known to the insurer at the time the insured tenders a claim in determining the scope of the insurer's defense obligation. *Montrose Chemical Corp.*, 6 Cal.4th at 287 (stating that the court must examine "the policy, the complaint, and all facts known to the insurer from any source"); *Barnett*, 90 Cal.App.4th at 508-09 ("The existence of the duty to defend turns on all facts known by the insurer at the inception of the third party lawsuit"); *CNA Casualty of Cal. v. Seaboard Surety Co.*, 176 Cal.App.3d 598, 605 (1986) ("An insurer's duty to defend must be analyzed and determined on the basis of any potential liability arising from facts available to the insurer from the complaint or other sources available to it at the time of the tender of defense").

Facts outside the complaint are considered because of the possibility that the pleadings could be amended to state a covered claim. See *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal.4th 643, 654 (2005) ("[T]the duty also exists where extrinsic facts known to the insurer suggest that the claim

10

may be covered"); *Montrose Chemical Corp.*, 6 Cal.4th at 296 ("[F]acts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy. This is so because current pleading rules liberally allow amendment; the third party plaintiff cannot be the arbiter of coverage" (citations omitted)); *State Farm Fire & Casualty Co.*, 59 Cal.App.4th at 657 ("In determining whether an insurer has a duty to defend, a court first compares the allegations in the complaint with terms of the policy. Next, it looks to facts that may not have been alleged but were known to the insurer when the action was filed"). "In the context of a [motion to dismiss], the absence of a duty to defend may be established when the allegations in the third party complaint disclose no basis for policy coverage, and the insured's complaint alleges no extrinsic facts that raise a possibility of coverage." *Total Call Intern., Inc. v. Peerless Ins. Co.*, 181 Cal.App.4th 161, 167 (2010).

"The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage." *Montrose Chemical Corp.*, 6 Cal.4th at 295. Thus, extrinsic evidence the insurer learns after denying a defense can give rise to a duty to defend. See *id.* at 296, 300 ("The duty to defend is determined by reference to the policy, the complaint, and *all* facts known to the insurer from any source"); see also *Systems XIX, Inc. v. United Capitol Ins. Co.*, No. C 98-0481 MJJ, 1999 WL 447599, *5 (N.D. Cal. June 23, 1999) (the duty to defend inquiry "focuses on what the insurer knew or should have known at the time of declining coverage").

"[T]he insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages potentially covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy." *Montrose Chemical Corp.*, 6 Cal.4th at 299 (citing *Gray*, 65 Cal.2d at 275-76); see also *Pepperell v. Scottsdale Ins. Co.*, 62 Cal.App.4th 1045, 1054 (1998). "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." *Horace Mann Ins. Co. v. Barbara B*, 4 Cal.4th 1076, 1081 (1993); see also *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal.App.4th 932, 942 (2003). The insured "'may not speculate about unpled third party claims to manufacture coverage,'" however. *Michaelian*, 50 Cal.App.4th at 1106 (quoting *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.,* 14 Cal.App.4th 1595,

1605 (1993)).  Thus, an insurer has no duty to defend where the potential for liability is "'tenuous and farfetched.'"  *Id. (*quoting *American Guar. & Liability v. Vista Medical Supply*, 699 F.Supp. 787, 794 (N.D. Cal. 1988)).

"Where a duty to defend exists as to one claim in an action, the insurer is obligated to defend against all claims in that action 'prophylactically' to ensure that an 'immediate' defense is provided." *Rizzo v. Ins. Co. of State of Pa.*, 969 F.Supp.2d 1180, 1190 (C.D. Cal. 2013) (citing *Buss v. Superior Court*, 16 Cal.4th 35, 48 (1997); *Horace Mann Ins. Co.*, 4 Cal.4th at 1081).  Thus, in a "mixed" action, an insurer may not "parse" the claims and defend only those that are potentially covered.  *Buss*, 16 Cal.4th at 49.  "Rather, the duty to defend arises if there is any potential for liability under the policy, regardless whether covered or noncovered claims predominate the action."  See *Rizzo*, 969 F.Supp.2d at 1190 (citing *Horace Mann Ins. Co.*, 4 Cal.4th at 1084).

### b.  Interpretation of Insurance Policies

Ordinary rules of contract interpretation apply to insurance contracts.  *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264 (1992).  "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties."  CAL. CIV. CODE § 1636.  Such intent is to be inferred, if possible, solely from the "written provisions of the contract."  *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 822 (1990).  If the contractual language is clear and explicit, it governs.  CAL. CIV. CODE § 1638.  See *Baker v. Nat'l Interstate Ins. Co.*, 180 Cal.App.4th 1319, 1327 (2009) ("If the language of the policy is not ambiguous, then the coverage inquiry ends, and the court determines coverage by applying the plain meaning of the unambiguous provisions of the policy"); *S. Cal. Edison Co. v. Superior Court*, 37 Cal.App.4th 839, 848 (1995) ("When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party.  If it is not, the case is over").

A policy's language is ambiguous when it is susceptible of two or more reasonable interpretations.  *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37.  Ambiguities may concern the fact or extent of coverage, *Continental Casualty Co. v. Phoenix Construction*, 46 Cal.2d 423, 437-38 (1956), and may arise from contradictory or necessarily inconsistent language in different portions of the policy, *Delgado v. Heritage Life Ins. Co.*, 157 Cal.App.3d 262, 271 (1984).  A court may not

adopt a strained or absurd interpretation of the policy language in order to find ambiguity where none would otherwise exist. *La Jolla Beach &Tennis Club*, 9 Cal.4th at 37.

When a court concludes that policy language is ambiguous, it examines whether a finding of coverage under the policy is consistent with the objectively reasonable expectations of the insured. *Baker*, 180 Cal.App.4th at 1328. See also *Bank of the West*, 2 Cal.4th at 1264-65 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it," quoting CAL. CIV. CODE § 1649). In determining whether coverage is consistent with the insured's objectively reasonable expectations, the disputed policy language must be examined in the context of its intended function in the policy. *Baker*, 180 Cal.App.4th at 1328; *Nissel v. Certain Underwriters at Lloyd's of London,* 62 Cal.App.4th 1103, 1111-12 (1998) ("[T]he disputed policy language must be examined in context with regard to its intended function in the policy. This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense,'" citing *Bank of the West*, 2 Cal.4th at 1265, 1276).[22]

Where ambiguity remains after application of the reasonable expectations test, the court construes the ambiguous policy language against the insurer, and in favor of coverage. *Baker*, 180 Cal.App.4th at 1328. Nonetheless, a court cannot rewrite a policy and bind an insurer to cover a risk that it did not contemplate covering, and for which it was not paid. *Id*.

c.     **Whether the Policy Covers Adams' Underlying Suit Against Zyskind**

As noted, Adams alleges that Hartford breached both its duty to defend Zyskind and to indemnify him. The court first determines whether the first amended complaint plausibly alleges that Hartford breached its duty to defend. If it does not, then *a priori* it does not adequately allege a failure to indemnify. See *Wood*, 217 Cal.App.3d at 947 ("Although insurers and insureds routinely speak

---

[22]Because endorsements to an insurance policy form part of the insurance contract, the policy and the endorsements must be construed together. *Adler v. Western Home Ins. Co.*, 878 F.Supp.1329, 1333 (C.D. Cal. 1995) (citing *Narver v. Cal. State Life Ins. Co.*, 211 Cal. 176, 181 (1930)). "[I]f there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls." *Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal.4th 38, 50 n. 4 (1997) (quoting *Continental Cas. Co. v. Phoenix Constr. Co.*, 46 Cal.2d 423, 431 (1956)).

of the insurer's duty to 'indemnify and defend' as if the duties were coextensive, it is well settled that the duty to defend is broader than the duty to indemnify").  Adams appears to allege that Hartford was obligated to defend and indemnify Zyskind under the policy's "business liability coverage" and/or its provision for "employee benefits liability coverage."[23]  The terms of the policy – which the court has judicially noticed – unambiguously exclude the underlying action from coverage under both theories.

The policy's "business liability coverage" obligates Hartford to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which [the policy] applies."[24]  As relevant here, the policy excludes from coverage any injury arising from an "employment-related practice."[25]  It defines "employment-related practice" as "bodily injury or personal and advertising injury to a person arising out of any . . . termination of that person's employment . . . or employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person."[26]

The policy's "employee benefits liability coverage" modifies Sheervision's business liability coverage.[27]  It provides coverage for "sums that the insured becomes legally obligated to pay as damages because of an 'employee benefits injury' to which [the policy] applies."[28]  It defines an "employee benefits injury" as an "injury that arises out of any negligent act, error or omission in the administration of [the insured's] 'employee benefits program.'"[29]  It defines "employee benefits program" as "a formal

---

[23]RJN, Exh. B ("Policy") at 63, 90; see also Opposition at 5 ("There are several insuring clauses in the subject policy – including personal injury, advertising injury, and employee benefits liability – any of which could (and should) have obligated Defendant to cover the underlying lawsuit against Zyskind").

[24]Policy at 63.

[25]Policy at 71.

[26]*Id.*

[27]*Id.* at 91.

[28]*Id.*

[29]*Id.* at 96.

program or programs of employee benefits maintained in connection with your business or operations, such as but not limited to . . . [g]roup life insurance, group accident or health insurance, profit sharing plans and stock subscription plans . . . unemployment insurance, social security benefits, workers' compensation and disability benefits."[30]

To determine whether the "business liability coverage" or the "employee benefits liability coverage" obligated Hartford to defend Zyskind against Adams' claims, the court must look to Adams' complaint in the underlying action – which it has also judicially noticed – to determine whether it reveals "a possibility that [any of] the claim[s Adams asserted might] be covered by the policy." *Montrose Chemical Corp.*, 6 Cal.4th at 295. As noted, in making this determination the court must focus not on the causes of action alleged, but on the facts underlying the claims. See *Swain*, 99 Cal.App.4th at 8 ("[C]overage turns not on the technical legal cause of action pleaded by the third party but on the acts alleged in the underlying complaint").

The second amended complaint in the underlying action alleged that Adams had been hired by Sheervision to serve as its Chief Financial Officer in April 2009.[31] In February 2010, he was appointed the company's secretary.[32] Simultaneously, he allegedly entered into a written agreement with Sheervision that had a number of terms governing Adams' employment.[33] Adams alleged that beginning in October 2010, Zyskind began to cause Sheervision to miss payroll and otherwise violate California labor law.[34] Adams purportedly told Zyskind that he did not condone the violations.[35] He alleged that he was subsequently refused a bonus and thereafter terminated. His second amended complaint in the underlying action pled that "Adams' complaints about Sheervision's California Labor

---

[30]*Id.*

[31]RJN, Exh. A ("Underlying SAC"), ¶ 11.

[32]*Id.*, ¶ 12.

[33]*Id.*, ¶ 13.

[34]*Id.*, ¶¶ 20–27.

[35]*Id.*, ¶ 28.

Code violations, and his refusal to condone or participate in this illegal conduct, were substantial motivating factors in Sheervision's termination of his Employment Agreement."[36]  It alleged that his termination violated public policy, as it constituted punishment for "standing up and speaking out for the legal rights of himself and his co-workers."[37]  The complaint also alleged that the termination had violated the terms of Adams' employment contract and the covenant of good faith and fair dealing implied therein;[38] that Sheervision's failure to pay Adams' wages and bonuses promptly constituted negligent infliction of emotional distress;[39] and that Sheervision had failed to pay Adams wages and reimburse him for business expenses in violation of California law.[40]  The pleading asserted that Zyskind had intentionally or negligently interfered with Adam's prospective economic advantage by causing these failures, i.e., that his actions in failing to pay or reimburse Adams had interfered with Adams' relationship with Sheervision.[41]

Although Adams' complaint pleads a variety of legal theories, all of his claims for relief are based on acts or omissions by Sheervision as Adams' employer, and Zyskind's role as a Sheervision officer in causing those acts and omissions.  See *Montrose Chemical Corp.*, 6 Cal.4th 287, at 295 ("Since pleadings are easily amended, the proper focus is on the facts alleged, rather than the theories for recovery").  Each allegation concerns an injury Adams suffered as a result either of his "termination" or of other "[e]mployment-related practices, policies, acts or omissions."[42]  For that reason, claims based on those facts are unambiguously excluded from coverage under the policy and cannot form the basis for a breach of contract claim against Hartford.  See *Ruksznis v. Argonaut Ins.*

---

[36]*Id.*, ¶ 57.

[37]*Id.*, ¶ 56.

[38]*Id.*, ¶¶ 62–79.

[39]*Id.*, ¶¶ 80–86.

[40]*Id.*, ¶¶ 126–137, 87–93.

[41]*Id.*, ¶¶ 138–150.

[42]Policy at 71.

*Co.*, 774 F.3d 784, 788, 790 (1st Cir. 2014) ("Ruksznis argues that the slander claim is payable under the CGL as a 'personal and advertising injury' and that the civil rights claims fall under the POL policy's 'wrongful act' coverage provision. . . . Each policy, however, includes an exclusion for 'employment-related' practices.[43] Ruksznis's judgment against Burgess arose from an employment-related dispute. The CGL and POL policies both unambiguously exclude coverage for claims arising from employment-related practices. Hence, we affirm the district court's order granting Argonaut's motion for summary judgment"); see also *Baker*, 180 Cal.App.4th at 1327 ("If the language of the policy is not ambiguous, then the coverage inquiry ends, and the court determines coverage by applying the plain meaning of the unambiguous provisions of the policy"); *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18–19 (1995) ("Courts will not strain to create ambiguity where none exists").

Adams' citation of *North American Building Maintenance, Inc. v. Fireman's Fund Ins. Co.*, 137 Cal.App.4th 627 (2006), is inapposite. There, the court addressed an employment-related practice exclusion similar to the one at issue here. *Id*. at 638. The trial court granted summary judgment in favor of the insurer, concluding that all of the underlying claims arose out of allegedly unlawful employment practices and thus fell within the exclusion. The appellate court reversed. It noted first that "[t]he trial court was correct in its major premise that, if [the insured]'s only potential liability was, as a matter of law, as an employer, then Fireman's Fund would not owe [the insured] a defense." *Id*. at 639. The court held, however, that because plaintiff in the underlying action was an independent contractor, the claims were not covered by the exclusion. *Id.* at 643. In direct contrast, Adams alleges that "[t]his case arises from the wrongful discharge of Plaintiff ADAMS from *his employment* with Sheervision."[44] He also asserts that he was "a former *employee* of . . . Sheervision."[45] Thus, because "[Zyskind's] only potential liability was . . . as [an officer of Adams'] employer . . . [Hartford] [did] not owe [Zyskind] a defense."

---

[43]The First Circuit quoted the language of the employment-related practices exclusions, which was essentially identical to Hartford's employment-related practices exclusion.

[44]FAC, ¶ 5 (emphasis added).

[45]Underlying SAC, ¶ 1 (emphasis added).

*North Am. Bldg. Maint.*, 137 Cal.App.4th at 639; see also *Evanston Ins. Co. v. OEA, Inc.*, No. CIV 02-1505 DFL, 2005 WL 1828796, *9 (E.D. Cal. Jul. 25, 2005) (awarding summary judgment to an insurer on a failure to defend claim because plaintiffs' "claim[s] [we]re excluded by the plain language of the employment exclusion clause"). This principle extends beyond the employer itself to officers and other individuals who have authority to terminate, demote, or make other employment decisions on the employer's behalf. See *Ruksznis*, 774 F.3d at 790 (holding that an "employment-related practices" exclusion in a municipality's insurance policy permitted the insurer to deny a defense to an individual who was a "Town Selectman" and who "took unspecified actions that caused Ruksznis to be removed from his position as plumbing inspector").

Nor does the complaint in the underlying action in any way concern an injury arising from an error in the "administration" of "employee benefits" as those terms are defined in Hartford's policy. First, the only "benefits" referenced in Adams' complaint are his salary and bonus, which he contended had been unlawfully withheld. As noted, the policy defines "employee benefits" as "a formal program or programs of employee benefits maintained in connection with your business or operations, such as but not limited to . . . [g]roup life insurance, group accident or health insurance, profit sharing plans and stock subscription plans . . . unemployment insurance, social security benefits, workers' compensation and disability benefits." The payment of wages and bonuses is not a "formal program . . . of employee benefits maintained in connection with" Sheervision's business. Salary and bonuses are not among the examples of "employee benefits" provided by the policy. While the policy states that employee benefits are not limited to the examples set forth, reading the policy to encompass wages would greatly expand coverage in a way that was clearly not intended. The examples listed refer to insurance, social security, and disability benefits which are generally intended to assist employees at certain periods (retirement, injury, sickness, etc.); general compensation for work performed simply does not fit within the policy definition nor is it similar to the examples provided. See BLACK'S LAW DICTIONARY (6th ed.), "Benefits" ("Financial assistance received in times of sickness, disability, unemployment, etc. either from insurance or public programs such as social security"); see also *United States v. Williams*, 533 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated"); *WPP Luxembourg Gamma Three*

18

*Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1051 n.3 (9th Cir. 2011) (applying the *noscitur a sociis* canon to interpret a contract and concluding that an alternative reading would be "strained and unnatural"). For these reasons, at least one district court in California has recently concluded that Hartford's "employee benefits" coverage does not cover claims arising from failure to pay wages. See *Granite Outlet, Inc. v. Hartford Cas. Ins. Co.*, No. 2:14-cv-00575-TLN, 2015 WL 300729, *4–6 (E.D. Cal. Jan. 22, 2015) (dismissing a claim against Hartford for that reason). Although it is theoretically possible that Adams' allegation that he was unlawfully deprived of a bonus might implicate a "profit sharing plan[ ] [or] stock subscription plan[ ]," his complaint pleads that the terms of his employment contract provided he "would earn a minimum guaranteed annual bonus of $25,000 on January 1 of each year."[46] It thus appears clear that the bonus was simply additional compensation in the form of wages, not part of a formal profit-sharing program.

Moreover, even if the payment of wages and bonuses could be considered "employee benefits," the employee benefits coverage extends only to damages arising from the "administration" of those programs, which is defined as "[g]iving counsel to your employees or their dependents and beneficiaries with respect to interpreting the scope of your employee benefits program or their eligibility to participate in such programs; [h]andling records in connection with 'employee benefits programs'; and [s]tarting or stopping any employee's participation in your employee benefits programs."[47] Specifically *excluded* from coverage are injuries arising from "[t]he failure of any person or organization to perform any obligation . . . with respect to [t]he payment of benefits under employee benefit programs."[48] "Therefore, even if the payment of wages [and bonuses], or the failure to pay wages [and bonuses], were considered an employee benefit program, the coverage would be excluded by this provision." *Granite Outlet, Inc*., 2015 WL, at *6 (interpreting this provision).

Based on the court's review of the complaint in the underlying action, and its review of the policy, it concludes that the policy unambiguously excludes all claims that could be alleged based

---

[46]*Id*., ¶ 13(d).

[47]Policy at 95.

[48]*Id*. at 92.

on the facts pled in the underlying action. See *Montrose Chemical Corp.*, 6 Cal.4th at 299. The facts alleged in the complaint did not "fairly apprise [Hartford] that the suit [was] upon a covered claim." *Michaelian*, 50 Cal.App.4th at 1106. For that reason, Adams has not plausibly alleged that Hartford breached its contractual duties under the policy, either to defend or – it follows – to indemnify. Because Adams has not plausibly alleged a duty to defend, he likewise has not adequately alleged that Hartford breached the covenant duty of good faith and fair dealing implied in the policy. See *Waller*, 11 Cal.4th at 36 ("It is clear that if there is no potential for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer"); see also *Pestmaster Servs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, No. CV 13–5039–JFW, 2014 WL 3844627, *10 (C.D. Cal. July 17, 2014) ("The claim against Travelers for breach of the implied covenant of good faith and fair dealing necessarily depends upon the claim for breach of contract. If Travelers was not bound or required to do anything under the Policy, its denial of coverage could not have been in bad faith"); *Am. Med. Intern., Inc. v. Nat. Union Fire Ins. Co. of Pittsburgh*, 244 F.3d 715, 723 (9th Cir. 2001) ("National Union owed no obligation to AMI and its actions could not have frustrated AMI's attempt to collect benefits. We are thus compelled to conclude that since there was no potential for coverage, the decision in *Waller* bars AMI's claim for breach of the implied covenant of good faith and fair dealing").

Nonetheless, it is not clear at this point that Adams' complaint cannot be saved by amendment. While the complaint in the underlying action did not notify Hartford of any obligation to defend under the policy, "[f]acts extrinsic to the complaint [can] also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Montrose Chemical Corp.*, 6 Cal.4th at 295; see *State Farm Fire & Casualty Co.*, 59 Cal.App.4th at 657. Specifically, Adams may be able to allege facts concerning extrinsic information known to Hartford that should have affected its decision about defense of the underlying action. See *Saylin*, 179 Cal.App.3d at 263 ("For an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, *but upon those facts known by the insurer at the inception*

*of a third party lawsuit*" (emphasis added)); see also *Scottsdale Ins. Co.*, 36 Cal.4th at 654 ("[T]he duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered"); *Montrose Chemical Corp.*, 6 Cal.4th at 296 ("[F]acts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy. This is so because current pleading rules liberally allow amendment; the third party plaintiff cannot be the arbiter of coverage" (citations omitted)). Because it is not "clear that the complaint could not be saved by amendment," the court dismisses the claim without prejudice. See *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008).

### III. CONCLUSION

For the reasons stated, the court grants Hartford's motion to dismiss with leave to amend. Adams may file an amended complaint within twenty (20) days of the date of this order if he is able to remedy the deficiencies the court has noted.

Adams may not plead new claims. Should the scope of any amendment exceed the scope of leave to amend granted by this order, the court will strike the offending portions of the pleading under Rule 12(f). See FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading"); see also *Barker v. Avila*, No. 2:09-cv-0001-GEB-JFM, 2010 WL 31701067, *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to a federal law claim where the court had granted leave to amend only state law claims).

DATED: November 23, 2015

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE